In re John Redden COLLINS, Bankrupt.

VAN LOTT, INC., Plaintiff,

v.

Philip WITTENBERG, as Trustee of John Redden Collins, Defendant.

Bankruptcy No. 79–316.

United States Bankruptcy Court, D. South Carolina.

Feb. 29, 1980.

virtue of a purchase money security agreement securing a promissory note, in default, on which there is due $16,603.27, and claiming a repairman's lien in the amount of $2,701.37 for unpaid repairs to said equipment, the plaintiff, Van Lott, Inc., which had sold the loader and rake to John Redden Collins (the bankrupt) prior to his bankruptcy, is asking that its combined claim of $19,304.64 be allowed as a secured claim against the bankruptcy estate.

The defendant is a trustee in bankruptcy, who, by § 70 of the Bankruptcy Act (11 U.S.C. § 110):

. . . is vested with the title of the bankrupt to all of his property of whatever kind and wherever located at the date of the filing of the petition except that which is exempt under the laws of the jurisdiction governing the matter of exemptions. The trustee takes such property not as a bona fide purchaser but in the dual role of a successor to the title of the bankrupt himself and of a creditor with a judgment, with an execution returned unsatisfied and one with a lien acquired through legal or equitable proceedings. 4A *Collier on Bankruptcy* ¶ 70.04 (14th ed. 1978).

Charles E. Hill of Turner, Padget, Graham & Laney, Columbia, S.C., for plaintiff.

Phillip Wittenberg of Levi & Wittenberg, P.A., Sumter, S.C., for defendant.

## MEMORANDUM AND ORDER

J. BRATTON DAVIS, Bankruptcy Judge.

The main issue is whether the financing statement, relating to the plaintiff's purchase money security interest, which has been timely recorded in the office of the Secretary of State, has been recorded in the proper place so that the plaintiff's claim to the secured property is superior to the claim of the trustee in bankruptcy.

Claiming current possession of and liens on a wheel loader[1] and a loader rake[2] by

### I

As to the lien claim of $2,701.37, the defendant (hereinafter trustee) admits that the plaintiff has a secured claim in the amount of $2,701.37 for repair services, furnished prior to the commencement of the bankruptcy case, to the wheel loader, which has been continuously in the possession of the plaintiff since the repairs were completed. *See,* Code of Laws of South Carolina 1976, § 29–15–10 (South Carolina Artisan's Lien Statute).

### II

As to the plaintiff's other lien claim ($16,603.27), the trustee contends that the plaintiff, because of improper filing of the fi-

---

1. A wheel loader is a piece of heavy equipment generally used for loading materials such as dirt or sand onto trucks.

2. A loader rake is an attachment that can be put on a wheel loader for use in clearing land.

nancing statement, does not have a perfected security interest in the equipment and that the trustee's title and defenses relating thereto, as given by § 70 of the Bankruptcy Act, place the trustee's claim to the equipment ahead of that of the plaintiff.

■ If the security instrument is unperfected, it is subordinated to the rights of the trustee in bankruptcy by the Uniform Commercial Code, Code of Laws of South Carolina 1976, § 36–9–301, which provides:

(1) . . . an unperfected security interest is subordinate to the rights of . . (b) a person who becomes a lien creditor without knowledge of the security interest and before it is perfected;

\*　\*　\*　\*　\*　\*

(3) A "lien creditor" means a creditor who has acquired a lien on the property involved by attachment, levy or the like and includes an assignee for benefit of creditors from the time of assignment, and *a trustee in bankruptcy* from the date of the filing of the petition . . . (emphasis added).

The bankruptcy petition was filed in the District of South Carolina on July 31, 1979.

On November 20, 1978, when the plaintiff sold the equipment to the bankrupt, then a resident of Horry County, South Carolina, the bankrupt executed the security agreement and the financing statement, the latter being filed with the Secretary of State of South Carolina on November 28, 1978, in accordance with Code of Laws of South Carolina 1976, § 36–9–401(1)(c).[3] Subsequently, the plaintiff sold the contract to Commercial Credit Equipment Corporation, with limited recourse. Upon the bankrupt's default, the plaintiff repurchased the contract for $16,603.27, the balance then due; and Commercial Credit assigned its interest in the contract back to the plaintiff.

The plaintiff claims a first lien on the equipment under the terms of its security agreement.

On the other hand, the trustee contends that the equipment was used by the bankrupt in *farming operations*, therefore, the security interest is perfected only if the financing statement has been recorded in the office of the Clerk of Court in Horry County, South Carolina, the county of the bankrupt's residence as required by the terms of § 36–9–401(1)(a), which says that a security interest in equipment used in farming operations is perfected properly if the financing statement is filed with the Clerk of Court in the county of the debtor's residence.[3] The trustee argues that, because there has been no such filing, the plaintiff's interest in the equipment is unperfected and that the trustee's interest in the equipment is, under § 36–9–301(1)(b), *supra*, superior to the security interest of the plaintiff.

The parties agree that if the collateral is equipment used in *farming operations* the financing statement should have been recorded in Horry County; if not, it was properly filed in the office of the Secretary of State.

### QUESTION

Was this equipment used in farming operations?

### DISCUSSION

#### I

■ In answering this question it is relevant to consider the equipment's use contemplated by the parties at the time of the sale and at the time of the recording of the financing statement. If the statement is properly recorded at the outset, the filing remains effective even if the use of the

---

**3.** § 36–9–401: "(1) The proper place to file an order to perfect a security interest is as follows:

(a) when the collateral is equipment used in farming operations, or farm products, or accounts, contract rights or general intangibles arising from or relating to the sale of farm products by a farmer, or consumer goods, then

in the office of the register of mesne conveyances or the clerk of the court in the county of the debtor's residence . . . .

\*　\*　\*　\*　\*　\*

(c) in all other cases, in the office of the Secretary of State."

equipment is changed. Section 36–9–401(3).[4]

■ In further addressing the question, it is noteworthy that on the security agreement the bankrupt stated that the collateral, i. e. the wheel loader and the rake, "is to be used primarily for business or commercial use (other than farming operations)." On the security agreement was a box where the bankrupt could—but did not—place a check mark indicating that the equipment was to be used by him "for farming operations."

The plaintiff's salesman, Mr. Richbourg, who sold the equipment to the bankrupt, testified that the plaintiff's business primarily is the sale of heavy construction equipment "to road builders, to asphalt producers, ready-mix concrete people, heavy duty operation." He described the wheel loader as a machine used "to load material on trucks"—such as sand, clay and gravel.

The bankrupt, according to the salesman:

. . . indicated that he had some property that had some sand on it that he felt was of commercial quality and he wanted to use this loader to mine or dig this sand and load it. He bought a rake for it also which he intended to use in conjunction with his loader for raking debris * * * after the 'dozers had pushed it over. He was doing some landscaping and he was interested in this machine because it had a multi-purpose bucket which is used a lot in landscaping where you can clamp debris, put it on a truck and haul it off.

The equipment, prior to the sale, had been owned and used by Darlington County for laying pipe. The bankrupt never discussed with the salesman the possibility of using it "in any kind of farming operation." The equipment was not sold for use in a farming operation, according to the salesman; nor was it the type of equipment generally used in a farming operation. The bankrupt did say that he needed something to use in forestry operation—for clearing land—not for himself; but for "somebody." However, the bankrupt did not indicate the forestry operation was "the major reason" he needed it.

The bankrupt, Mr. Collins, testified:

*BY MR. HILL:*

\* \* \* \* \* \*

Q. Did you discuss with Mr. Richbourg when you were talking about this loader what you intended to do with it?

A. I believe we talked about it generally a year ago.

Q. Just tell the Court in general what your conversation was with Mr. Richbourg.

A. Well, I can't remember—I can remember specifically that I needed a loader for doing some work, that I had purchased some property, to load some sand. I told him that a I needed a loader because of the various things I was doing. I needed something to load dirt with and to do various projects that I was undertaking.

Q. Did you mention something to Mr. Richbourg about using equipment in sand mining?

A. Yes.

Q. Did you have some property that had some sand on it?

A. Yes. Well, not at that time, I was looking for property. I had property that I could get sand from. I didn't actually own any sand property at that time but I did have access to some sand.

Q. And I believe you also mentioned something about building a road?

A. Yes, I do some road work for people.

\* \* \* \* \* \*

---

**4.** Section 36–9–401(3) provides that a filing which is made in the proper place in this State continues effective even though the debtor's residence or place of business or the location of the collateral *or its use,* whichever controlled the original filing is thereafter changed. (Emphasis added).

The South Carolina Reporter's Comments, relating to § 36–9–401, are: "Also, under this subsection, if the use of the collateral is changed so that it requires a new classification * * * the original filing remains effective."

Q. And so you talked to Mr. Richbourg about the possibility of using it to get out some sand and using it in road construction?

A. Yes, that and other things; that was not the only things.

Q. Mr. Collins, at this time were you also engaged in some landscaping work?

A. Yes, I did a fair amount of landscaping.

\*    \*    \*    \*    \*    \*

A. You would go into a yard where they were building a new house and you would clean all the small trees and debris from where they built the house. The stuff they threw away, you clean it up and haul it off and then you haul some dirt back in there and spread it out and plant grass.

Q. Would a piece of equipment like this loader and rake be useful in landscaping work?

A. Well, yes, it would give you a tremendous amount of versatility in what you could do.

Q. And in fact did you use it in your landscaping work?

A. Yes.

Q. All right, sir, you talked about landscaping yards. Were you also doing some what you might call public work at this time?

A. Yes, I would do things by the job or I would work by the hour. If anything came up where anybody would pay me such and such dollar an hour to work, why, then I would do that.

Q. And would you use this equipment in your public work?

A. Yes, that was the most expensive piece of equipment I had. It would see the most extensive use.

Q. Describe for the Court some of these public work type jobs that you used this equipment on.

A. Well, I built some roads for one man. I cleaned off numerous lots. I did reforestation. I would clean up debris, pile it up and general landscaping type work and, of course, I loaded dirt with it also when I needed dirt.

Q. How were you paid when you did the public work?

A. Well, you would either go in and say, "Well, I will do this for so many dollars", or I would work for $30 an hour, depending on what I was doing and how I agreed with the individual I was doing the work for.

Q. Were you doing some landscaping work in Conway with this equipment?

A. Yes, I did some in Conway.

Q. Did the City of Conway or Horry County require you to have a license?

A. The City of Conway.

Q. What kind of license?

A. A landscape license.

Q. Mr. Collins, when you bought this equipment did you intend to use it in any kind of farm operation?

A. Well, in my opinion it was not a piece of farm machinery. I had farm machinery and I intended to use it as to reforestation but I was not—well, it was for hire. Whatever a person wanted done is what I would do.

Q. You didn't do any reforestation with this equipment on your own land?

A. No, I didn't.

Q. Did you in fact own some farmland during this time?

A. Yes, I did.

Q. And what sort of crops were you planting on your farmland?

A. Corn, soybeans and oats.

Q. Did you ever use this wheel loader in connection with your corn and soybeans and oat crops?

A. No.

BY MR. WITTENBERG:

Q. Mr. Collins, you said you and Mr. Richbourg talked about some other things that you were going to use it for. What other things?

A. Well, I can't remember the exact conversation but I imagine I mentioned reforestation.

Q. Well, he remembered you said that so you did tell him that you were going to use it in reforestation?

A. (The witness nodded affirmatively).

Q. And reforestation means what?

A. You clean up an area of land, get the debris off of it—old trees, limbs and stuff—and get them out of the way and then you come back and you plant trees, pine trees.

\*   \*   \*   \*   \*   \*

Q. What percentage of the time did you put this piece of machinery to use in reforestation?

A. Well, the way it ended up I probably used it three-fourths of the time. I had one big job.

\*   \*   \*   \*   \*   \*

The "big" reforestation job was done in Marion County by Collins for his father who paid him for the work.

From what has been discussed hereinabove, it is apparent that, at the time of the sale (November 20, 1978) and at the time of the filing of the financing statement (November 28, 1978), both the buyer and the seller of the equipment contemplated that it would be used primarily for the bankrupt's business or commercial use (other than farming operations). And, in fact, that is how it was used.

The original filing, having been properly made, remains effective even though the use of the equipment may have changed.

## II

■ Having made that determination, it is not necessary to consider the trustee's argument that the bankrupt's subsequent use of the equipment in his contractual business of clearing land for others in reforestation constituted "farming operations" thus mandating that the financing statement be recorded in Horry County, South Carolina. Nevertheless, the bankrupt's reforestation activities do not appear to fall within the definition of "farming operations" as contemplated by § 36–9–401(1)(a), *supra* ; and for that additional reason, the filing herein was proper.

*Belgrade State Bank v. Elder*, 157 Mont. 1, 482 P.2d 135 (1971), 8 UCC Rep. 1359, specifically rejects the argument that forestry is agricultural, *ergo* farming.

In *In re Blease*, 24 UCC Rep. 450 (D.N.J. 1978), the court concluded that farming should be defined in terms of a conventional farm operation, and before equipment will be found to be "used in a farming operation" it must be used directly to perform tasks customarily done on farms.

Although we find no definition of *farming operations* in the Uniform Commercial Code, § 36–9–109 does define farm products. For an item to be a farm product, it must be in the possession of a "debtor engaging in raising, fattening, grazing or other farming operations." Comment 4, following § 36–9–109, suggests that the phrase "farming operations" is to be narrowly construed.

When the bankrupt began using the equipment in reforestation work, the reforestation was that of the landowner who contracted for services and equipment of the bankrupt. The bankrupt had no proprietary interest in, nor possession of, the land, or the trees, or their products. His use was not a farming operation as intended by § 36–9–401(1)(a).

## CONCLUSION

■ The filing in the office of the Secretary of State perfected the plaintiff's lien, affording the plaintiff a perfected security interest in the equipment which is superior to the claim of the trustee.

## ORDER

Therefore, it is ORDERED, ADJUDGED AND DECREED that the plaintiff's lien claim of $19,304.64, representing $16,603.27 due under the terms of the security agreement and $2,701.37 secured by the artisan's lien, respectively, is superior to the claim of the trustee.