**In re BOB SCHWERMER & ASSOCIATES, INC., Robert A. Schwermer and Clara Mae Schwermer, Debtors.**

**Bankruptcy Nos. 82 B 5901, 82 B 5893.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

Jan. 25, 1983.

Marcy Newman, Newman & Stahl, Chicago, Ill., for First Bank of Evanston.

Bryan Krakauer, Sidley & Austin, Chicago, Ill., for FDIC.

Ronald Peterson, Jenner & Block, Chicago, Ill., for Creditors' Committee.

## MEMORANDUM, OPINION AND ORDER

EDWARD B. TOLES, Bankruptcy Judge.

This matter coming on to be heard upon the application for leave to sell race horses filed by the Debtors, BOB SCHWERMER & ASSOCIATES, INC., ROBERT A. SCHWERMER AND CLARA MAE SCHWERMER, [Debtors] represented by DAVID N. MISSNER, Attorney at Law, and the objections thereto of the FEDERAL DEPOSIT INSURANCE CORPORATION. (F.D.I.C.), represented by BRYAN KRAKAUER, Attorney at Law, and the Unsecured Creditors' Committee (Creditors), represented by RONALD R. PETERSON, Attorney at Law, and

The Court having examined the pleadings filed in this matter, having received and examined memoranda of law submitted by parties in support of their respective positions, having heard the arguments of counsel, and the Court being fully advised in the premises.

The Court Finds:

1. On May 5, 1982, the Debtors filed voluntary petitions for arrangements under Chapter 11 of the Bankruptcy Code. Prior to the initiation of these proceedings, ROBERT A. SCHWERMER, owned six thoroughbred race horses known as:

ESPY,

SILVER ACT,

MARBO,

MY BOY BILL,

BOB'S MAJESTY and

DIAMOND DUCHESS

ROBERT A. SCHWERMER, granted to the FIRST NATIONAL BANK AND TRUST COMPANY OF EVANSTON (Bank) represented by NEWMAN & STAHL a security interest in and to said horses as evidenced by various security documents. Said horses served as collateral for certain loans from the Bank. As of the date of filing of the instant proceedings the sum of $842,134.66 was due the Bank. In addition to the horses, the Bank also holds a security interest in and to certain machinery and equipment of BOB SCHWERMER & ASSOCIATES, INC. As of October 27, 1982, the Bank's total claim against ROBERT A. SCHWERMER and BOB SCHWERMER & ASSOCIATES, INC. is the sum of $892,-662.73.

2. On November 9, 1982, the Debtors filed the instant application to sell the above described horses to the Bank for the sum of $600,000. In said application it was asserted that on the date of filing of the Chapter 11 proceedings the horses had a fair market value of between $150,000 and $400,000, and that in order for the horses to retain that value they require training, exercise, feed, shots and must be raced. The Debtors state in their application that under their present financial circumstances proper care can not be given the horses. The Debtors state in their application that the Bank has offered to take possession of the horses and credit the indebtedness of the Debtors in the amount of $600,000.00, and that the Bank has offered to retain its lien against the machinery and equipment of the Debtors to the extent of only $200,-000. On this basis the Debtors state in their application that if the Bank receives from the sale of the horses sums in excess of the $200,000, the balance would be distributed among the unsecured creditors.

3. On November 29, 1982 the Bank filed a stipulation of facts to which no party in interest has objected and which provides in relevant part as follows:

1. On April 21, 1980, a $700,000.00 Demand Collateral Promissory Note in favor of the First National Bank and Trust Company of Evanston ("FirstBank Evanston") was executed by Schwermer entities and guaranteed by other Schwermer entities and personally guaranteed by Robert A. and Clara Mae Schwermer, in accordance with Guaranty Agreements dated April 21, 1980.

2. On August 20, 1980, a replacement Demand Collateral Promissory Note in the amount of $1,250,000.00 in favor of FirstBank was executed, repayment thereof still being guaranteed by Robert A. Schwermer, pursuant to Guaranty Agreement dated April 21, 1980.

3. On May 21, 1981, additional financing and other accommodations were arranged for Robert A. Schwermer personally as well as Schwermer entities, by FirstBank Evanston.

4. On June 12, 1981, in order to take additional security regarding the financing for Robert A. Schwermer and Robert A. Schwermer entities, in connection with the outstanding notes and commitment of FirstBank Evanston a Security Agreement was executed by Robert A. Schwermer in favor of FirstBank Evanston. Said Security Agreement grants FirstBank Evanston a security interest in eight thoroughbred race horses, six of which are listed as assets of Robert A. Schwermer's pending bankruptcy action and still owned by Robert A. Schwermer. A copy of the executed Security Agreement was attached to each of the original six Foal papers for each horse, and said six Foal papers were delivered to FirstBank Evanston.

5. On June 30, 1981, a Tri-Party Escrow Agency Agreement was executed by and between FirstBank Evanston, Robert A. Schwermer and James Burchell, the trainer of the horses. In order for a thoroughbred horse to be allowed to race

at a given race track, Foal papers must be at the track on the day of the race. Therefore, Foal papers were delivered to James Burchell, the trainer, subject to his agreement to return, after each race, said Foal papers to FirstBank Evanston.

6. On July 9, 1981, a copy of the Tri-Party Escrow Agreement was sent to the Horsemen's Bookkeeper at Arlington Race Track, Arlington Heights, Illinois (the location of the races for said horses) and was acknowledged by said office on July 20, 1981.

7. On July 30, 1981, a letter from counsel representing FirstBank Evanston was transmitted to The Jockey Club of New York which is the "Office of the Registrar" for the "American Stud Book" for all thoroughbred racing horses. The Jockey Club acknowledged the security interest of the FirstBank Evanston by letter dated August 14, 1981 and reflected said security interest on the duplicate Foal certificate records of The Jockey Club books.

8. On July 31, 1981, duplicate copies of the executed Security Agreement, as well as financing statements, were filed under the provisions of the Illinois Uniform Commercial Code with the Illinois Secretary of State, as Document No. 1565648.

9. On August 12, 1981, FirstBank Evanston was added as a loss payee to the Livestock Transportation and Mortality Policy issued by the Central National Insurance Company of Omaha, Nebraska, Policy No. 1CN2441788, insuring all of the horses.

11. On June 17, 1982, FirstBank Evanston continued its insurance coverage on the horses, and a new insurance certificate was issued at the expense of First-Bank Evanston.

12. On September 22, 1982, The Jockey Club reacknowledged FirstBank Evanston's interest and indicated that to date, no duplicate certificates have been applied for on any of the referenced thoroughbred racing horses.

13. On October 1, 1982, after the last racing date at Arlington Race Track, which was September 30, 1982, the race horses were transported to the Keenland Race Track, Keenland, Kentucky.

The Court Concludes and Further Finds:

1. The Creditors and F.D.I.C. have both objected to the above described sale and allege that said sale is designed to hide defects in the Bank's security interest. Specifically, the alleged defects in the Bank's security interest are as follows:

1. The horses fall within the UCC definition of farm products or consumer goods, and therefore the financing statement must have been filed with the Recorder of Deeds for the County of the debtor's residence pursuant to Section 9–401(1)(a) of the Illinois Commercial Code.

2. Because the horses at various times were moved out of Illinois to Arkansas and Florida, the Bank was obligated to refile its financing statement in each state after four months, pursuant to Sec. 9–103(1)(d)(i) of the Uniform Commercial Code.

3. The Bank's security interest is not valid because the description of the collateral was not sufficient within the purview and meaning of Sec. 9–402(1) of the Illinois Commercial Code, and contains errors with reference to the Debtor's name and address.

4. Assuming that the security interest was validly perfected in Illinois in July of 1981, the interest became void four months after the horses were moved to Arkansas and Florida, and any reperfection of the security interest would fall within 90 days of the Debtor's Chapter 11 filing and would constitute a voidable preference within the purview and meaning of Section 547 of the Bankruptcy Code.

5. Assuming that the security interest was valid, the loans subsequent to the execution of the note in 1980, pursuant to a letter of commitment of the Bank dated May 21, 1981, may constitute a fraudulent conveyance one year prior to the filing of the Chapter 11, within the pur-

view and meaning of Section 548 of the Bankruptcy Code.

■ 2. In order for a security interest to attach to collateral, pursuant to Sec. 9–203 of the Illinois Commercial Code, there must be an agreement, value and collateral. In the instant case the Debtors who owned the horses executed the subject security agreement on June 12, 1981. Said agreement was executed in exchange for a commitment from the Bank to forbear collection of pre-existing debt. On July 31, 1981, the Bank filed a financing statement with the Illinois Secretary of State, as Document No. 1565648. Provisions of Section 9–401(1) of the UCC requiring filing with the County Recorder of Deeds in the county of the Debtor's residence is only applicable where farm products are involved or where the goods are purchased for the debtor's personal use. Security interests in equipment are perfected by filing of the financing statement with the Secretary of State pursuant to Section 9–401(1)(c) of the Illinois Commercial Code. Under Section 9–109(2) of the UCC equipment is defined as goods which are, "used or bought for use primarily in business (including farming or a profession)." In the instant case, the Debtor has submitted an affidavit in which it is stated that the horses were purchased for business purposes, as race horses. In said affidavit it is stated that the Debtor does not farm or breed horses. In cases where live stock is owned by persons not engaged in farming the animals are not considered farm products. *Swift & Co. v. Jamestown National Bank,* 7 UCC Rep.Serv. 788 (8th Cir.1970); *Security National Bank v. Belleville Livestock Commission Co.,* 26 UCC Rep. Serv. 528 (10th Cir.1979), *Cookeville Production Credit Association v. Frazier,* 33 UCC Rep.Serv. 1150, 16 B.R. 674 (U.S.Bkrtcy.M. D.Tenn.1981); *Mountain Credit v. Michigan Lumber & Supply, Inc.,* 10 UCC Rep.Serv. 1347, 31 Colo.App. 112, 498 P.2d 967 (Colo.C. A.1972); *In re Collins,* 28 UCC Rep.Serv. 1520, 3 B.R. 144 (U.S.Bkrtcy.S.C.1980); *First State Bank v. Maxfield,* 485 F.2d 71

(10th Cir.1973). On the basis of clear statutory language, case law and the facts of this case it must be concluded that the horses are equipment, and thus the Bank's security interest was duly perfected by the filing of a financing statement with the Illinois Secretary of State.

■ 3. Pursuant to Section 9–403(2) of the Illinois Commercial Code a security interest remains perfected for a period of five years from the date of filing of the financing statement. However, the F.D. I.C. and Creditors argue that because at various times the horses were transported to Florida and Arkansas that the security interest had to be reperfected in Florida and Arkansas four months after the horses were moved from Illinois, pursuant to Section 9–103 of the UCC. This Court must reject this argument and conclude that the perfection of the security interest in Illinois remains valid. No intervening security interests on behalf of the Creditors' Committee or any other party attached while the horses were in other jurisdictions, and the horses were in the State of Illinois prior to the filing of the instant Chapter 11 proceeding. The purpose of Section 9–103 of the Illinois Commercial Code is to settle disputes between two parties from different states who both claim a security interest in the chattel, and it should not be applicable where no intervening security interest exists. *See* 68 *Michigan Law Review* 684 (1970).

4. Pursuant to Section 9–402(1) of the Illinois Commercial Code the requisites for a financing statement are as follows:

(1) A financing statement is sufficient if it gives the names of the debtor and the secured party, is signed by the debtor, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor and contains a statement indicating the types, or describing the items, of collateral ... A copy of the security agreement is sufficient as a financing statement if it con-

tains the above information and is signed by the debtor. . . .

Pursuant to Section 9–402(8) of the Illinois Commercial Code Statutes errors in filing the financing statement are treated as follows:

A financing statement substantially complying with the requirements of this Section is effective even though it contains minor errors which are not seriously misleading.

In the official comments to Section 9–402(8) of the Illinois Commercial Code it is stated:

Subsection (8) is in line with the policy of this Article to simplify formal requisites and filing requirements and is designed to discourage the fanatical and impossibly refined reading of such statutory requirements in which courts have occasionally indulged themselves. . . .

Ill.Rev.State. Chap. 26 Sec. 9–402 p. 288

Section 9–402 and the sufficiency of the description of collateral additionally must be viewed in conjunction with Section 9–110, which provides as follows:

For the purposes of this Article any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described.

■ Various courts have recognized that pursuant to the above detailed filing provisions termed "notice filing", the financing statement is not intended to enable other creditors to learn the "true nature" of the secured transaction. The purpose of the notice provision is merely to apprise other creditors that others may have a security interest in the subject collateral and that creditors should resort to the security agreement for further information. *In re Cushman Bakery,* 526 F.2d 23 (1st Cir.1975) *cert. denied Agger v. Seabroad Allied Milling Corp.* 425 U.S. 937, 96 S.Ct. 1670, 48 L.Ed.2d 178 (1976). *In re Malzac,* 14 UCC Reporting Service 1223 (D.V.T.1974). *In re Moore,* 34 UCC Reporting Service 773, 777, 21 B.R. 898 (Bkrtcy.E.D.Tenn.1982). *First National Bank of St. Charles v. Chemical Products, Inc.,* 34 UCC Reporting Service 300 (Missouri Ct.App., E.D.1982).

■ In the instant case the Creditors filed a financing statement and a copy of the security agreement. Said financing statement merely contains the Debtor's and Creditor's name and address, and the notation "16" for collateral. However, the security agreement attached to and filed with the financing statement contains in relevant part the following information:

| | |
|---|---|
| Tamarock's Rule | Espy |
| Bruce South | Marbo |
| My Boy Bill | Bob's Majesty |
| Silver Act | Diamond Dutchess |

Property *

* Is evidenced by various foal certificates presently on file with officials at Arlington Heights Race Track, A. Hts, ILL.

In view of the purpose of a financing statement and the liberal filing provisions of the Illinois Commercial Code it must be concluded that the financing statement and security agreement are sufficient to establish a perfected security interest within the purview and meaning of Sections 9–402 and 9–110 of the Illinois Commercial Code;

5. Pursuant to Section 547(b) of the Bankruptcy Code transfers to creditors may be avoided by a debtor or trustee in relevant part as follows:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedant debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent

(4) made—

(A) on or within 90 days before the date of the filing of the petition; . . .

■ In the instant case the Court must conclude that the granting of a security interest on July 31, 1981, can not constitute a voidable preference because the transfers occurred more than 90 days prior to the date the petition was filed on May 5, 1982. The Court has already rejected arguments

that the security interest lapsed upon transportation of the horses to Arkansas and Florida. On this basis it could not be claimed that the interest to remain valid must be reperfected in Illinois upon return of the horses to this state within the 90 day period prior to filing of the Chapter 11.

6. Pursuant to Section 548 of the Bankruptcy Code the trustee or debtor-in-possession may avoid any transfers of the debtor's property or any obligations incurred one year before the filing of the bankruptcy petition if the debtor:

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer occurred or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or become insolvent as a result of such transfer or obligation;

. . . . . . .

In the instant proceeding the F.D.I.C. has alleged that the Letter of Reinstatement and Restructure of Debt prepared by the Bank on May 21, 1981, in addition to the security agreement executed on June 16, 1981, all occurring within one year from the date of filing, indicate that the security interest taken by the Bank may constitute a fraudulent transfer within the purview and meaning of Section 548 of the Bankruptcy Code. The F.D.I.C. argues that despite the fact that the original loans were made in 1980, two years prior to filing, the forbearance in collection of the indebtedness by the Bank in exchange for a security interest in the horses executed on June 16, 1981, constitutes an obligation incurred one year prior to bankruptcy. This Court is persuaded by appellate authority cited by the FDIC, *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979 (2nd Cir.1981). In that case it was held that although credit lines and security agreements were executed prior to the one year period specified under Section 548 of the Bankruptcy Code, affiliates of the debtor corporation had drawn on the line of credit within the one year period. *I.D.* at 989. In *Rubin* the Second Circuit Court of Appeals remanded the proceeding to the Bankruptcy Court for further hearings on the issues of consideration and debtor's insolvency at the time of the transfers *Id.* at 991–996.

This Court too must conclude that the threshold issue of a transfer one year prior to bankruptcy has been established sufficiently to warrant a hearing on the issues of consideration and insolvency under Section 548(a)(2) of the Bankruptcy Code. The F.D.I.C. or Creditors Committee has not alleged any actual intent on the part of the debtor to hinder or defraud creditors.

Because the application of the Debtors to sell the horses has pended since November 9, 1982, due to the numerous objections of the F.D.I.C. and Creditors' Committee, and the horses will decrease in value as time passes, the hearing should be held at the earliest possible date for a final determination of ownership of the horses.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that all discovery be completed by February 11, 1983, and any additional pleadings be filed by February 11, 1983, and a final hearing on the application to sell horses, pursuant to Section 548(a)(2), be, and the same is hereby set for February 15, 1983, at 2:00 P.M.