**In re C.H. BUTCHER, Jr., Debtor.**

**James R. MARTIN, Trustee, Plaintiff,**

**v.**

**Dean LANDERS, Lewis S. Howard, Trustee for Syndicate-Cable Investment Trust and Irwin A. Deutscher, Trustee for Southern Industrial Banking Corporation, Defendants.**

**Bankruptcy No. 3–83–01008.**
**Adv. No. 3–83–0839.**

United States Bankruptcy Court,
E.D. Tennessee.

June 15, 1984.

---

Neal S. Melnick, Baltimore, Md., James R. Moore, Knoxville, Tenn., for plaintiff.

F.L. Burnette, II, Mark C. Dickinson, Des Moines, Iowa, Henry W. Simon, Jr., Fort Worth, Tex., Richard S. Stair, Jr., Knoxville, Tenn., for defendant Dean Landers.

David E. Rodgers, Knoxville, Tenn., for defendant Lewis S. Howard, Trustee.

W. Morris Kizer, Knoxville, Tenn., for Irwin A. Deutscher, Trustee, and Bank of Commerce, successor in interest to Southern Indus. Banking Corp.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CLIVE W. BARE, Bankruptcy Judge.

At issue is whether a quarter horse stallion, originally purchased primarily for the purpose of selling syndicated shares of ownership in the horse and subsequently used for the purpose of providing breeding services for a fee, constitutes either a "farm product" or "equipment used in farming operations" within the meaning of Article Nine of the Uniform Commercial Code. Trial was held March 6, 1984.

### I

An involuntary chapter 7 case was commenced against the debtor on June 24, 1983. The order for relief was entered July 15, 1983, and an order approving the election of the trustee was entered on August 17, 1983. The trustee commenced this adversary proceeding on September 14, 1983, seeking to avoid a security interest asserted by the defendant Landers.

On February 8, 1982, the defendant Landers sold Sonny Dee Bar, a registered quarter horse stallion, to the debtor. The debtor executed an $810,000.00 promissory

note to Landers as well as a security agreement granting Landers a security interest in the horse. Landers filed a financing statement with the Secretary of State of Texas on February 11, 1982.

Originally, Landers had negotiated in 1981 with several other individuals who wished to acquire the horse, along with several other equally reputable stallions, for the formation of an investment syndicate offering to investors fractional shares of ownership (with attendant breeding rights) in all of the horses. The proposed syndication never became a reality because the offerors were unable to raise sufficient investment funds within the necessary time. Thus, the syndication concept was abandoned in late 1981.

Apparently, these individuals nonetheless proposed to attempt to establish a somewhat similar operation in a different format. The debtor became involved in the concept at this point and, apparently, purchased Sonny Dee Bar in anticipation of another public offering being made. These plans never materialized.

Prior to the sale the horse had stood at stud at Landers' property in Iowa. After the sale the debtor stabled the horse at Redgate Quarter Horse Farms, Inc. in Valley View, Texas.

In January 1983, the debtor conveyed the horse to the Syndicate-Cable Investment Trust, a trust established for the benefit of the debtor's son. In exchange, the trust assumed the $729,000.00 balance due on the debtor's note to Landers and, additionally, the trust executed a $500,000.00 note to the debtor. The trust gave the debtor a security interest in the horse, securing the trust's obligations on the $500,000.00 note and its assumption of the debtor's note to Landers.

On January 4, 1983, the debtor negotiated the $500,000.00 note without recourse to Butcher Tennessee Investment Corporation (solely owned by the debtor) which in turn negotiated the note without recourse to Southern Industrial Banking Corporation. The debtor received $500,000.00 through this transaction. Southern Industrial, as assignee of the security interest securing payment of the note, subsequently filed financing statements in Cooke County and Denton County, Texas, the situs of the Redgate Quarter Horse Farms.

The breeding of quarter horses is a highly sophisticated business governed by rigid regulations promulgated by the American Quarter Horse Association. These regulations carefully detail the approved procedures for the breeding of quarter horses. Essentially, the regulations call for the impregnation of the mare by artificial insemination under the supervision of a qualified veterinarian. The mare is brought to the site of the stallion and insemination is accomplished without the intervention of any freezing or preservative process.

The rights and duties of the parties in the breeding process are set forth in a standard breeding contract between the stallion owner and the owner of the mare. Under a typical breeding contract the stallion owner does not undertake after completion of the breeding process to raise or train the offspring. Thus, as the owner of Sonny Dee Bar, the debtor's involvement in the breeding process was limited to the extraction of semen from the stallion, the implantation of the semen in the mare, and the boarding and care of the mare during the process. While at Redgate, Sonny Dee Bar commanded a breeding fee ranging from $3,500.00 to $5,000.00 per impregnation.

The debtor was a banker and businessman whose activities involved numerous investment and ownership interests in various business entities. There is no indication that the debtor owned and bred mares to Sonny Dee Bar or engaged in the raising and training of quarter horses.[1] From all

---

1. The security agreement with Landers arguably appears to contemplate the possible involvement of the debtor in breeding his own mares in that it provides that "this security interest shall not extend to any of rights, title, interests or properties in any offspring of Debtor's mares born out of breedings with Sonny Dee Bar ...." However, nothing indicates that the debtor actu-

indications, while owned by the debtor and by the trust established by the debtor for his son, the horse was used exclusively to provide breeding services for a fee.

## II

The plaintiff trustee contends that the defendant Landers' asserted security interest in Sonny Dee Bar may be avoided under 11 U.S.C.A. § 544(a) (1979). The trustee argues that the horse constituted either a farm product or equipment used in farming operations. Thus, the trustee maintains that under the Uniform Commercial Code, as enacted into Texas law, Landers' security interest could only be perfected by local filing in the office of the County Clerk of the county where the horse was kept. Failure to so perfect, says the trustee, renders the unperfected security interest subject to being avoided by the trustee exercising his rights as a judicial lien creditor under 11 U.S.C.A. § 544(a) (1979).

The defendant Landers contends that the horse was neither a farm product nor equipment used in farming operations but was, rather, equipment utilized in a business venture. Thus, Landers maintains that his security interest was properly perfected under applicable Texas law by central filing with the Texas Secretary of State.

## III

■ Initially, this court must address the jurisdictional question of whether the dispute as to the validity of this security interest is properly before the district court.

The trustee in bankruptcy brought this action to avoid Landers' security interest under 11 U.S.C.A. § 544(a) (1979). Under § 544(a), of course, the trustee would have the rights and powers of a judicial lien creditor with respect to all property of the debtor which would be, at the time of the

commencement of the bankruptcy case, subject to a judicial lien. Thus, the trustee exercising such rights would have the power to avoid the transfer of an unperfected security interest in such property. However, at the commencement of the debtor's bankruptcy case Sonny Dee Bar was not property of the debtor which would be subject to a judicial lien. When the bankruptcy case was commenced, the debtor no longer owned Sonny Dee Bar. He had previously transferred the horse into trust for the benefit of his son.[2] A judicial lien creditor would not be entitled to enforce a lien by levy upon property which did not belong to the debtor. Thus, even were Landers' security interest improperly filed, and therefore unperfected, the trustee would not be entitled to avoid the transfer of the security interest because a judicial lien creditor would have no rights to a horse which the debtor did not own.

Nonetheless, the resolution of the dispute as to whether this security interest was validly perfected is properly before the district court. Despite the holding of the United States Supreme Court in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), invalidating the pervasive grant of bankruptcy court jurisdiction under 28 U.S.C.A. § 1471(c) (Supp. 1984), the district court has retained "original but not exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11." 28 U.S.C.A. § 1471(b) (Supp.1984); *White Motor Corp. v. Citibank*, 704 F.2d 254 (6th Cir.1983).

. It has been observed:

Whether a given proceeding arises in or is related to a bankruptcy case should be determined by whether the outcome of that proceeding might conceivably affect the nature or value of the estate, the

ally owned or bred mares or involved himself in the raising and selling of quarter horse offspring.

**2.** The trustee in bankruptcy originally included causes of action alleging that this transfer to the trust was a fraudulent conveyance under 11

U.S.C.A. § 548 (1979). However, the trustee in bankruptcy subsequently abandoned this contention. Thus, no argument is made that the transfer of the horse itself to the trust was invalid or voidable.

claims against the estate or the administration of the estate.

1 *Norton Bankruptcy Law and Practice* § 5.07 at 10 (1984).

*E.g. Crown Central Petroleum Corp. v. Wechter (In re General Oil Distributors),* 21 B.R. 888 (Bankr.E.D.N.Y.1982); *See also* 1 *Collier on Bankruptcy* ¶ 3.01 at 3–49 (15th ed. 1984).

As the court noted in *Heagle v. Haug,* 19 B.R. 223 (Bankr.D.Or.1982):

> [T]here must be a reasonable nexus or logical connection between the civil proceeding for which jurisdiction is sought and the parent bankruptcy proceeding. A tenuous connection between the controversy and the debtor, his assets, and the administration of his estate will not support jurisdiction ....

19 B.R. at 224.

In *Cincinnati Milacron Marketing Co. v. Ramirez (In re Wesco Products Co.),* 19 B.R. 908 (Bankr.N.D.Ill.1982) the court defined the line of demarcation between a tenuous connection and a reasonable nexus as follows:

> If an action against a non-debtor will affect the debtor's schedules of assets or liabilities filed in the bankruptcy court, the action involving the non-debtor is "related to" the bankruptcy case, and this court has original jurisdiction over the action involving the non-debtor.

19 B.R. at 909.

Thus, the frequently applied test of jurisdiction has been whether the outcome of the dispute will have a direct impact on the debtor's assets or liabilities. *E.g. In re Bretano's, Inc.,* 27 B.R. 90 (Bankr.S.D.N.Y. 1983) (lessor's suit against debtor's lease guarantor where grantor would have claim for indemnity against debtor); *Otero Mills, Inc. v. Security Bank & Trust,* 25 B.R. 1018 (Bankr.D.N.M.1982) (jurisdiction to enjoin collection of state court judgment against debtor's president where president was required under reorganization plan to contribute assets to debtor); *Peoples Banking Co. v. Hartley,* 16 B.R. 777 (Bankr.N.D.Ohio 1982) (foreclosure on mortgage given by non-debtor defendants

on property in which debtors had no interest to secure debtors' performance on promissory note).

Where such an impact has not been sufficiently shown the courts have found no jurisdiction. *See Heagle v. Haug,* 19 B.R. 223 (Bankr.D.Or.1982) (no jurisdiction over action against non-debtor defendants in common law fraud action brought against both debtor and non-debtors); *United Coal v. Hoyer,* 29 B.R. 1019 (W.D.Va.1983) (no jurisdiction over defamation action against attorneys of debtors).

In the instant case the determination of the status of Landers' lien will have a direct and dramatic impact on the debtor's estate. If Landers prevails, his exercise of his Article Nine rights against the horse would presumably satisfy the debt owed him and would eliminate the liability of the debtor's estate on the note to Landers. On the other hand, if Bank of Commerce (successor in interest to Southern Industrial) prevails, its exercise of its Article Nine rights would result in Landers remaining partially or wholly unpaid. Landers would, of course, continue to have a claim on the promissory note against the estate. Thus, resolution of this dispute bears directly on the amount of the claims asserted against the debtor's estate and, consequently, upon the distribution of the debtor's assets.

Additional factors reinforce the conclusion that this matter is a "related" matter within the meaning of 28 U.S.C.A. § 1471(b) (Supp.1984). Although the horse itself is not property of the debtor's estate, the debtor did, upon transferring the horse to the trust, retain a security interest in the horse to secure the trust's obligations on the $500,000.00 note and the trust's assumption of liability on the debtor's note to Landers. Subsequently, the debtor did, of course, negotiate the $500,000.00 note to Butcher Tennessee Investment Corporation (who negotiated the note to Southern Industrial). The financing statements filed in Cooke County and Denton County indicated assignment of the security interest in the horse to Southern Industrial. However,

such an assignment only effects a transfer of the security interest to the extent that the security interest secures the obligation transferred. The secured obligations retained by the assignor continue to be secured by the security interest. *McAllester v. Jackson,* 5 B.R. 164 (Bankr.M.D.Tenn. 1980). Thus, although the debtor assigned that portion of the security interest necessary to secure payment of the $500,000.00 note, he retained a security interest in the horse to secure the trust's obligation to assume the $729,000.00 balance on the debtor's note to Landers. Clearly, the retained security interest constitutes property of the debtor's estate. Furthermore, this dispute involves property (i.e. the assigned security interest) of Southern Industrial Banking Corporation, also a debtor in bankruptcy proceedings currently pending before this court.[3] Resolution of this matter necessarily means, then, the disposition of property interests belonging to two estates in bankruptcy before this court. Undoubtedly, a matter thus involving property of the estate and so directly affecting the amount of the claims asserted against the estate may be said to be "related" within the meaning of 28 U.S.C.A. § 1471(b) (Supp.1984).

In accordance with the Rule for the Administration of the Bankruptcy Court, entered December 23, 1982, and referring to the Bankruptcy courts of this district all cases "arising in or related to cases under Title 11," this court is authorized to submit to the district court these findings, conclusions and proposed judgment.

### IV

■ The defendant Landers properly perfected his security interest in Sonny Dee Bar by central filing with the Texas Secretary of State. Texas has adopted the 1972 revision of Article Nine of the Uniform Commercial Code.[4] Accordingly, the Texas statute provides:

*Place of Filing; Erroneous Filing; Removal of Collateral*

(a) The proper place to file in order to perfect a security interest is as follows:

(1) when the collateral is equipment used in farming operations, or farm products, or accounts or general intangibles arising from or relating to the sale of farm products by a farmer, or consumer goods, then in the office of the County Clerk in the county of the debtor's residence or if the debtor is not a resident of this state then in the office of the County Clerk in the county where the goods are kept, and in addition when the collateral is crops growing or to be grown in the office of the County Clerk in the county where the land is located;

(2) when the collateral is timber to be cut or is minerals or the like (including oil and gas) or accounts subject to Subsection (e) of Section 9.103, or when the financing statement is filed as a fixture filing (Section 9.313) and the collateral is goods which are or are to become fixtures, then in the office of the County Clerk in the county where a mortgage on the real estate would be filed or recorded;

(3) in all other cases, in the office of the Secretary of State.

Tex. Business and Commerce Code Ann. § 9.401 (Vernon Supp.1984).

In addition, the Texas statute provides the following definitions:

*Classification of Goods; "Consumer Goods"; "Equipment"; "Farm Products"; "Inventory"*

Goods are

---

3. Bankruptcy Case No. 3–83–00372.

4. Texas law controls the question of the validity and perfection of this security interest. Landers' security interest attached in Iowa. Under Iowa Code Ann. § 554.9103 1.c. (Supp.1983–84) where the parties understood at the time of attachment that the goods would be kept in another jurisdiction, and the goods are taken to the other jurisdiction within thirty days, the law of the other jurisdiction governs perfection. Texas law thus governs the question of the perfection of Landers' security interest.

(1) "consumer goods" if they are used or bought for use primarily for personal, family or household purposes;

(2) "equipment" if they are used or bought for use primarily in business (including farming or a profession) or by a debtor who is a non-profit organization or a governmental subdivision or agency or if the goods are not included in the definitions of inventory, farm products or consumer goods;

(3) "farm products" if they are crops or livestock or supplies used or produced in farming operations or if they are products of crops or livestock in their unmanufactured states (such as ginned cotton, wool-clip, maple syrup, milk and eggs), and if they are in the possession of a debtor engaged in raising, fattening, grazing or other farming operations. If goods are farm products they are neither equipment nor inventory;

(4) "inventory" if they are held by a person who holds them for sale or lease or to be furnished under contracts of service or if he has so furnished them, or if they are raw materials, work in process or materials used or consumed in a business. Inventory of a person is not to be classified as his equipment.

Tex. Business and Commerce Code Ann. § 9.109 (Vernon Supp.1984).

Under the facts of this case the stallion was neither a farm product nor equipment used in farming operations. To constitute a farm product the horse must have been livestock (1) used in a farming operation and (2) in the possession of a debtor engaged in raising, fattening, grazing or other farming operations. To constitute equipment used in farming operations the horse must have been used or bought for use primarily in the business of farming. The syndication enterprise and the breeding service for which the debtor respectively purchased and used the horse do not constitute farming or farming operations.

Article Nine of the Uniform Commercial Code does not define the term "farming operations." However, "farming" has been defined as "the business of cultivat-ing land, raising stock, etc.; agriculture, husbandry." 4 *The Oxford English Dictionary* 78 (1933). Further, "agriculture" has been defined as "the science and art of cultivating the soil; including the allied pursuits of gathering in the crops and rearing live stock . . . ." 1 *The Oxford English Dictionary* 191 (1933). To "farm" has been defined as "to engage in raising crops or livestock." *Webster's New Collegiate Dictionary* 412 (1979).

Significantly, the U.C.C. language specifically enumerates "raising, fattening, grazing" as constituting farming operations. The official U.C.C. Comment is instructive. The drafters observe:

> The terms "crops," "livestock" and "farming operations" are not defined; however, it is obvious from the text that "farming operations" includes raising livestock as well as crops
>
> . . . .

Tex. Business and Commerce Code Ann. § 9.109 comment 4 (Vernon Supp.1984). The language of the drafters' comment suggests that the phrase "farming operations" is to be narrowly construed. *Van Lott, Inc. v. Wittenberg (In re Collins)* 3 B.R. 144, 149 (Bankr.D.S.C.1980).

The concept of "farming" and "farming operations" clearly contemplates involvement in the wide range of activities associated with the raising of crops or livestock and not merely the rendition of a service related to such crop or livestock production. More simply, the definitions and the commentary cited above stress the notion of *raising* crops or livestock as the essence of farming. It is this involvement in process of growing or developing crops and livestock that defines farming. In the case of crops, farming contemplates the cultivation, caring for and harvesting of the crops. In the case of livestock, farming similarly contemplates the breeding, maintaining, and bringing to maturity of the animals and the subsequent marketing of the animals or their raw products.

Merely undertaking an activity ancillary to this process does not alone constitute a

farming operation. "To be [engaged in] farming operations the debtor must actually be engaged in farming, not farm related or farm support or farm like activities." *John M. Saums, Inc. v. Blease,* 24 U.C.C. Rep. 450, 453 (D.N.J.1978) (local filing of financing statement held sufficient to perfect security interest in grain dryer owned by debtor engaged in multiple occupations and used both for commercial drying operation and drying corn raised by debtor himself).

Thus, the mere fact that equipment is of a type useable on a farm, or in fact is actually physically employed on a farm, is not determinative. For example, an excavating contractor, half of whose jobs involve excavating and clearing for farmers, is not engaged in a farming operation. *Still v. Murfreesboro Production Credit Association (In re Butler),* 3 B.R. 182 (Bankr.E.D.Tenn.1980). As the court noted: "The fact that on occasion the debtor contracted with a farmer does not change the business of an excavating contractor into a farming operation." *Id.* at 183.

In *Van Lott, Inc. v. Wittenberg (In re Collins),* 3 B.R. 144 (Bankr.D.S.C.1980) use by the bankrupt of a wheel loader and rake in commercial reforestation work was held not to constitute a farming operation. Noting that the reforestation work was for a landowner who contracted for the bankrupt's services and equipment, the court observed: "The bankrupt had no proprietary interest in, nor possession of, the land, or the trees, or their products." *Id.* at 149. *See also In re La Rose,* 7 U.C.C.Rep. 964 (D.Conn.1970) (tractor and loader, purchased by debtor employed as full-time laborer who used equipment primarily to haul logs and only incidentally to plow father's garden, held not "farm equipment."); *In re McQuaide,* 5 U.C.C. 802 (D.Vt.1968)

(diesel tractor used primarily in feed and farm supplying business held "equipment").

■ Although there is arguably some ambiguity in the statutory language [5] the better and generally accepted rule is that the debtor's stated, intended use at the time of attachment of the security interest defines the nature of the goods for purposes of ascertaining the proper place for perfecting the security interest.[6] *In re Barnes,* 11 U.C.C.Rep. 670 (D.Me.1972) (intended use controls where car originally purchased for personal use, was subsequently used in debtor's business); *Commercial Credit Equipment Corp. v. Carter,* 13 U.C.C. 1212 (Wash.1973) (intent at time of attachment controls where debtor intended at time of purchase to use airplane for personal rather than commercial purposes); *McGehee v. Exchange Bank & Trust Co.,* 23 U.C.C. 816 (Tex.Civ.App. 1978) (debtor's intent at time of purchase controls where boat, purchased primarily for personal and family use, was subsequently used in Coast Guard service). *See generally* J. White & R. Summers, *Uniform Commercial Code* 943–46 (2d ed. 1980).

However, there is at least some authority suggesting that the subsequent actual use of the collateral controls. *Woodson v. Utica Square National Bank (In re McClain)* 447 F.2d 241 (10th Cir.1971), *cert. denied* 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972) (disregarding representations in the security agreement that truck was to be used primarily in business and inquiring instead into actual use of truck as consumer goods).

In either case, one must determine the principal use. The statutory language it-

**5.** The statute defines as "equipment" goods "used *or bought for* use primarily in business (including farming or a profession) ...." Tex. Business and Commerce Code Ann. § 9.109(2) (Vernon Supp.1984) (emphasis added). Thus, the statutory language itself "gives no indication about which controls if the actual use and intended use conflict." J. White & R. Summers, *Uniform Commercial Code* 943 (2d ed. 1980).

**6.** This is, of course, barring other factors such as a false declaration of intent by the debtor or the creditor's actual knowledge of, or reliance upon, an actual use contrary to the debtor's stated intention. *See* J. White & R. Summers, *Uniform Commercial Code* 945–46 (2d ed.1980).

self speaks of "use *primarily* in business (including farming or a profession) ...." Tex. Business and Commerce Code Ann. § 9.109(2) (Vernon Supp.1984). In addition, the drafters make clear that in a borderline case "the principal use to which the property is put should be considered as determinative." Tex. Business and Commerce Code Ann. § 9.109 comment 2 (Vernon Supp.1984).

In the instant case, Landers' security agreement with the debtor does not expressly state an intended use for the horse. Arguably, it contemplates the raising of quarter horses by the debtor since it provides that Landers' security interest "shall not extend to ... offspring of Debtor's mares born out of breeding with Sonny Dee Bar ...." However, it just as clearly provides that breeding rights to the collateral may be sold "in the ordinary course of business." Thus, there is no clear, explicit expression of the principal intended use in the security agreement itself. The circumstances at the time of the sale of the horse to the debtor, however, clearly indicate that the *principal* intended use was the syndication of the stallion. The essential nature of this primary, intended use was the business of selling fractional shares of ownership (with accompanying breeding rights) in the horse—in short, an investment marketing scheme.

Furthermore, the principal, indeed sole, purpose for which the stallion was actually used was the provision of stud services to other quarter horse owners. The essential nature of the subsequent, actual use was the business of providing a farm-related service, i.e. the insemination of the mare, for a fee.

Thus, neither the principal, intended use nor the subsequent, actual use of the collateral constituted farming operations. Sonny Dee Bar was not equipment primarily used or bought for use in farming operations. Nor was Sonny Dee Bar livestock used in farming operations and in the possession of one engaged in farming operations. The horse was neither "equipment used in farming operations" nor a "farm product" within the meaning of Article Nine.[7]

This court acknowledges that *North Ridge Farms, Inc. v. Trimble*, 37 U.C.C. Rep. 1280 (Ky.Ct.App.1983) held that a syndicated fractional interest in a thoroughbred stallion retired at stud was a "farm product" since it was contemplated that the stallion would be retired from racing and utilized in a "farming operation, i.e. breeding." *Id.* at 1289.[8] However, in *Trimble* the court concluded:

> [T]he primary value of ownership of a share of a stallion that has been retired from racing and is standing at stud ... is the right to make annual nominations of mares to be bred to the stallion ... [and] the value of the fractional interest lies solely in its appurtenant breeding rights ....

*Trimble* at 1286–87.

Thus, the court in *Trimble* assumed that the principal use of the fractional ownership interest was to enable the owner to breed mares to the stallion, and presumably, to engage in raising the offspring. This court does not find that such was either the intended or actual principal use of Sonny Dee Bar by the debtor. The debtor intended to engage in an investment marketing scheme. The debtor (and subsequently the trust to which he conveyed the

---

**7.** The court notes that the security agreement assigned to Southern Industrial specifically provides that the trustee of the Syndicate-Cable Investment Trust purchased the horse "primarily for use in his farming operations." However, the issue necessary for decision of this matter is simply the determination of whether Landers' security interest was perfected, the court need not inquire further nor decide whether Southern Industrial could properly perfect its security interest based upon the intended use set forth in its security agreement. Once Landers' security

interest is determined to be perfected, Southern Industrial's status is subordinate to that of Landers, regardless of whether Southern Industrial's interest was or was not perfected.

**8.** *c.f. In re Bob Schwermer & Associates, Inc.*, 27 B.R. 304 (Bankr.N.D.Ill.1983) (horses purchased for business purposes as race horses by debtor who neither farmed nor bred horses, held "equipment").

horse) actually engaged in the business of providing a farm-related service. These were not farming operations within the meaning of Article Nine.

Having found that Sonny Dee Bar was neither a farm product nor equipment used in a farming operation, this court need not decide whether the stallion constituted "equipment" or "inventory" under Tex. Business and Commerce Code Ann. § 9.109 (Vernon Supp.1984). In either case the proper place for the filing of a financing statement to perfect a security interest in the horse would be the office of the Secretary of State of Texas. Tex. Business and Commerce Code Ann. § 9.401(a)(3) (Vernon Supp.1984).

In accordance with Rule 52 of the Federal Rules of Civil Procedure, this report constitutes findings of fact and conclusions of law.