**In re John Rau MAIKE, Sandra Rosann Maike, Debtors.**

**Bankruptcy No. 87–10376.**

United States Bankruptcy Court,
D. Kansas.

May 12, 1987.

Edward J. Nazar, Redmond, Redmond, O'Brien & Nazar, Wichita, Kan. trustee.

## MEMORANDUM OF DECISION

JOHN K. PEARSON, Bankruptcy Judge.

This Chapter 12 case is before the Court upon the motions of the Federal Deposit Insurance Corporation ("FDIC") and the Federal Land Bank of Wichita ("FLB") to dismiss on the grounds that the debtors are not family farmers under the Bankruptcy Code. The debtors appeared by William F. Kluge III. The FDIC appeared by Anton C. Andersen. The FLB appeared by William H. Zimmerman, Jr. The trustee, Edward J. Nazar, appeared in person.

The motions are founded upon the movants' conclusions that the debtors are not farmers because a majority of their income is derived from the breeding, raising and sale of puppies. The FLB motion, since withdrawn, was founded upon the premise that since what the Maikes' sell is not for human consumption, they are not farmers. The FDIC would expand that premise somewhat by asserting that since the product is neither intended for human *use* or consumption the Maikes are not farmers. The FDIC argues further that the dogs are not livestock and therefore the debtors do not fall within the statutory definition of farmer and finally that the income derived from the resale of dogs purchased from others is not farm income.

The question presented is essentially one of law: Does the debtors' nontraditional enterprise constitute a farming operation?

### FACTS

The debtors filed their Chapter 12 petition on February 10, 1987 listing a total indebtedness of $586,700.48, which is owed primarily to the FLB and the FDIC. A plan was filed with the petition and noticed out for confirmation on March 19, 1987. Because of the objections and motions filed by the FLB and FDIC, the Court rescheduled the confirmation hearing pursuant to § 1224. On April 15, the Court heard evidence on the motions to dismiss. Unfortu-

William F. Kluge III, Lambdin & Kluge, Chartered, Wichita, Kan. for debtors.

Anton C. Anderson, McAnany, Can Cleve & Phillips, P.A., Kansas City, Kan. for FDIC.

William H. Zimmerman, Wallace, Dewey & Zimmerman, Wichita, Kan. for FLB.

nately neither side sought to produce or elicit detailed evidence of the debtors' income from their various enterprises at the hearing. The 1986 income tax returns had not been prepared. Thus, the Court can only find that a percentage of the debtors' income is from a particular enterprise. Exact figures were not presented.

The debtors own 365.5 acres of land in rural Wabaunsee County, Kansas. Ten acres are devoted to breeding and raising pheasants. The pheasants are either hunted on the game farm which is operated by the debtors or resold to others. Seventy-four acres are planted to small grains and alfalfa, which is fed to the pheasants. Fifty acres are in hay, which is cut and sold to neighbors for cash. Two hundred thirty-five acres are in pasture and leased on a cash rent basis to a neighbor. One and one-half acres are occupied by the debtors as their dwelling and five acres are devoted to the kennel enterprise.

The debtors raise AKC registered canines. As of April 15, the debtors owned some 1,000 dogs of all varieties and sizes. Approximately 500 are breeding stock and approximately 275 are puppies bred and raised in their kennel.

The debtors also purchase litters of puppies from other breeders in a four-state area and bring them to their kennel for grooming and worming before they are resold to retail pet stores or the public. On April 15 they had approximately 200 puppies purchased from other breeders.

The kennel enterprise has two aspects: breeding and what the parties have termed the "brokerage." The breeding operation is obvious: The debtors breed their own dogs and sell them directly to the public, retail pet stores, and certain guard dog operations. The "brokerage" involves the marketing of the dogs bred in the kennel and of puppies purchased from other breeders. The use of the term "brokerage" was the source of considerable confusion at the hearing as each side chose to place a different meaning on the term. Although Mrs. Maike used the term throughout her testimony, in many respects it does not accurately describe the debtors' method of oper-

ation. Mrs. Maike testified that she used the term "brokerage" to describe the marketing of their dogs, both bred and purchased.

Generally the term "brokerage" describes a middleman who arranges the sale of a commodity or real estate. A broker generally does not take possession of the subject of the sale and only receives a commission based on the sale price. By contrast, the Maikes buy litters of puppies at eight weeks of age from other breeders and bring them to their kennel in Wabaunsee County, Kansas where they are groomed and medicated for resale. Presumably the litters are broken up and the puppies sold individually to pet stores and occasionally to the public. According to Mrs. Maike, they generally do not have a resale arranged when they buy a litter. The resale aspect of the kennel enterprise accounts for approximately sixty percent of the debtors' income and the sale of dogs bred in the kennel accounts for thirty percent. As the kennel enterprise accounts for ninety percent of the debtors' gross income, the resale aspect would account for over fifty percent of the debtors' income. Notwithstanding the terminology of the parties, the debtors are not brokers in any sense of that term. The resale of the dogs purchased elsewhere does not disqualify the debtors from being farmers.

The debtors sell approximately 7,000 puppies and dogs a year, and project gross income of over one million dollars per year from the kennel operation for the next three years.

## DISCUSSION

In ruling on these motions, the Court must determine the scope of the definition of farming operation.

Only a "family farmer" is eligible for the broad relief available under Chapter 12. § 109 That term is somewhat cumbersomely defined in the Code in terms of an individual "engaged in a farming operation." § 101(17) The restrictions on income and indebtedness in the definition are not relevant here because if the kennel is found to be a farming operation, the income and

debt tests are met. § 101(17)(A) "Farming operation includes farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state." § 101(20).

■ The definition of farming operation is inclusive, not exclusive. § 102(3) and (5) Thus while some of the more traditional farming operations are listed, other activities may be considered farming operations. The legislative history indicates that the definitions of farmer and farming operation are to be liberally construed. *In re Blanton Smith Corporation*, 7 B.R. 410 (Bankr.M.D.Tenn.1980).

The debtors live on what can only be described as a farm in rural Kansas. The debtors' use of the land for their primary source of income is not what would be traditionally considered farming. Perhaps the Court should end the dispute by declaring dogs livestock without further discussion. As noted below, the definition of livestock seems to turn on the choice of the dictionary. Holding dogs to be "livestock" merely to bring this case within a superficial interpretation of the statute would unnecessarily broaden the definition of farming operation to cover virtually any zoo or amusement park. Likewise to declare the debtors "farmers" merely because they reside in the country would be too broad a construction of the statute. The real question is what factor or factors should be considered in determining whether an enterprise is a farming operation, and therefore entitled to the relief afforded under Chapter 12.

Farmers have not always been afforded special status under the various bankruptcy laws. The special protection afforded farmers against involuntary bankruptcy petitions did not exist under the Bankruptcy Act of 1867, 14 Stat. 517, § 39. The protection was added to garner support from the rural congressmen for the adoption of the

Bankruptcy Act of 1898. The definition of "farmer" adopted in 1898, 30 Stat. 544, was an exclusive and very limited one which protected what might be described as the "traditional" dirt farmer. A similar definition was adopted in 1933 for the farm reorganization chapters, and subsequent amendments expanded the definition slightly, but not materially, generally adding the obvious. *See* 11 U.S.C. § 203, 47 Stat. 1467.

In 1978, however, the Congress adopted a very broad, inclusive definition which does not limit farming to prescribed pursuits personally performed. This is appropriate, since farming has changed dramatically since the Nineteenth Century. The definition is one of federal law. However, the changes in agriculture suggest that a liberal reading of any definition is required. For example, in the early years of the settlement of Kansas, corn was the most common crop; the wheat for which Kansas is famous was not extensively planted until hard red winter wheat was introduced from Russia in the 1880's. Soybeans were not introduced into this part of the country until the 1920's and did not become a major cash crop until approximately ten years ago. New hybrid varieties make old crops viable where they were never before considered. Many of the farmers experiencing financial difficulties now are in trouble because of their inability to adjust to changing conditions and methods. Farmers continually try new crops and enterprises in pursuit of profitability. Christmas trees, catfish and even wine grapes are now raised on "farms" in Kansas.[1] Farmer status should not depend on the court's recoginition of the debtor's enterprise as a traditional farming enterprise.

The machinery and farming methods of today are dramatically different than even thirty years ago. The machinery is bigger and more expensive and crop varieties have changed dramatically in blight resistance and yield.

---

1. The suggested "consumption" test, while reflecting a certain cultural chauvinism, is not

viable: vis-a-vis, horses, milo and cotton.

Livestock operations have also changed since the days of the Cimmaron Trail when virtually wild Texas longhorns were driven north to the railhead in Kansas for shipment east by rail for slaughter. The many exotic registered breeds now have very little resemblance to the longhorn cattle of the last century in disposition or meat production. Most dramatically changed is the method of finishing cattle. Most beef is now bred on a ranch, but finished in a feedlot where the rations and other conditions are strictly and scientifically controlled. The feedlot bears little resemblance to the ranch of the last century. Most of the cattle raised in Kansas are now slaughtered in giant factories, located near the feedlots, making the state the largest producer of boxed beef in the United States.

Poultry and egg production in the automated chicken factories are also dramatically different from the chicken ranches of yesteryear. Many of the current poultry operations are fully enclosed, computerized and bear no resemblance to the traditional henhouse. While recognizing this, the courts have held that the egg factories are still farming operations under the Bankruptcy and Uniform Commercial Codes.

■ Farming as an enterprise has changed and the definition in law must also change. Formulation of an operable definition is difficult as no one factor should determine whether an individual or enterprise is a farming operation. Rather, the court should consider a number of factors in making the determination.

As noted, ultimately the definition of farmer under the Bankruptcy Act of 1898 was exclusive. It provided:

For the purposes of this section and section 4(b), the term "farmer" includes not only an individual who is primarily bona fide personally engaged in producing products of the soil but also any individual who is primarily bona fide personally engaged in dairy farming, the production

of poultry or livestock, or the production of poultry products or livestock products in their unmanufactured state, or the principal part of whose income is derived from any one or more of the foregoing operations, and includes the personal representative of a deceased farmer; and a farmer shall be deemed a resident of any county in which such operations occur. 11 U.S.C. § 203(r).

The courts construed the statute narrowly and several amendments were made to the language of the statute to add poultry and dairy farming as acceptable enterprises. *See First National Bank & Trust Co. v. Beach*, 301 U.S. 435, 57 S.Ct. 801, 81 L.Ed. 1206 (1937); and generally the cases collected at 3 A.L.R.2d 544 (1949), "Who Is a 'Farmer' Within Provisions of Bankruptcy Act (§ 75) for Agricultural Compositions and Extensions." Although the Tenth Circuit interpreted the definition rather liberally (*see, e.g., Layton v. Thayne*, 133 F.2d 287 (1943)), the tendency seems to have been to restrict the definition to the traditional "dirt farmer" and to exclude all others. 3 A.L.R.2d 544 (1949) The courts generally adopted the "totality of circumstances" test from the *Beach* case:

Whether or not the appellee is a farmer within the purview of this Act must be determined by the facts and circumstances in this case "viewed in combination," and the character of the enterprise in which she was engaging determined by "the totality of its circumstances."

*Federal Land Bank v. Wood*, 129 F.2d 89, (8th Cir.1942), *cert. denied*, 317 U.S. 662, 63 S.Ct. 63, 87 L.Ed. 532 (1942). Generally the courts remained hostile to nontraditional agricultural pursuits. In *In re Dunkly*, 64 F.Supp. 10 (N.D.Cal.1946), the district court concluded that a fish hatchery was not a farming operation within the meaning of the statute since fish were obviously not livestock.[2] Noting that fish are "ferae naturae" rather than domestic animals, the court concluded that fish are not

---

2. The Court noted several definitions for livestock including the Webster's Collegiate Dictionary definition: "Livestock—*domestic animals* used or raised on a farm, especially those kept for profit." (Emphasis added.) At least under Kansas law dogs are considered domestic animals. *See* K.S.A. 29–101.

livestock. The court refused to expand the generally accepted definition of farming to include a fish farm citing the restrictive wording of the statute.

More recent cases under the Bankruptcy Code on farming operations have dealt with the more traditional enterprises, albeit in some rather unusual forms. In *In re Blanton Smith Corporation*, 7 B.R. 410 (Bankr.M.D.Tenn.1980), the court concluded that the definition of farming operation (former § 101(18)) covered the corporate agribusiness debtor. Noting that the statute was to be given a broad interpretation by the drafters, the court concluded that the debtor's commercial poultry operation was a farming operation. The case reviews much of the legislative history and some of the Act caselaw on the issue of farmer status.[3] Under a restrictive or traditional definition, the debtor's large scale poultry and egg operation would have hardly been considered a farm notwithstanding the fact that poultry raising is traditionally considered a farm activity.

In *Armstrong v. Corn Belt Bank*, 55 B.R. 755 (C.D.Ill.1985), *rev'd in part and aff'd in part*, 812 F.2d 1024 (7th Cir.1987), the Circuit considered whether, despite his leasing of land, the debtor remained a "farmer" under the Code. The debtor had ceased active farming and cash leased his land when a creditor began involuntary proceedings against him. He defended on the theory that he was a farmer and not subject to an involuntary proceeding. Both the district court and the court of appeals disagreed. While apparently ignoring the holding in *First National Bank v. Beach, supra,* where the Supreme Court held that the debtor was a farmer under the Act definition even though he received a portion of his income from cash renting his farm land, the Seventh Circuit, on appeal, concluded that a cash lease arrangement did not constitute "... a risk-laden venture in the nature of farming." 812 F.2d at 1027. While the court of appeals agreed with the need for a broad construction of the statute as referred to in *In re Blanton Smith Corporation*, 7 B.R. 410, *supra,* the court concluded that the cash lease arrangement was not to be considered a farming operation. The analysis ignores the fact that traditionally, farmers have leased part or all of their operations at various times. *See First National Bank v. Beach,* 301 U.S. at 440, 57 S.Ct. at 803–04.

■ The analysis also ignores the plight of the elderly farmer who has farmed all his life and finds a Chapter 12 necessary to salvage the family homestead. If poor health or poor management mandated the rental of the farming ground to fund a feasible Chapter 12 plan, the court should consider the debtor a farmer since the cash flow from the lease may be more stable than crop or livestock income. There is authority for the proposition that a farmer remains a farmer for at least one year after affirmatively abandoning all pursuit of actual farm operations. *In re Potmesil,* 42 B.R. 731 (D.C.W.D.La.1984).

In *In re Blanton Smith Corporation, supra,* the bankruptcy court considered the problems of the poultry business. In *Blanton Smith,* the court ruled that a large integrated poultry operation was to be considered a farming operation notwithstanding the fact that it did not fit the traditional concept of a farm. In *In re Dakota Lay'd Eggs,* 57 B.R. 648, 542 (Bankr.D.N.D.1986), the court had before it an involuntary petition against still another agribusiness debtor involved in the egg business. The alleged debtor resisted the petition on the grounds that it was a farmer under the Code. While the debtor was incorporated under North Dakota law, it had not registered as a farm or ranch corporation and never filed annual reports as a farm or ranch corporation. The debtor marketed eggs in the United States and Canada. Part of the eggs were produced in facilities and by hens owned by the debtor. Debtor also had various other arrangements where it owned the flock, but not the facility, where it contracted for the purchase of eggs produced in other facilities, by hens owned by other farmers, and where it purchased eggs from producers on a "spot" or

---

**3.** Other poultry cases are discussed below.

open market basis. After an evidentiary hearing the court made detailed findings as to all the different sources of eggs and income and ruled that the debtor was not a farmer under the income test contained in § 101(17). After a thorough analysis of a large number of cases relating to the poultry business the court concluded that only income from the sale of eggs produced in operations owned or leased by the debtor could be counted in determining whether the debtor met the eighty percent test of § 101(17). The court never really considered whether the debtors nontraditional way of conducting a traditional farming enterprise, i.e., egg production, constituted a farming operation. In determining whether the debtor's income came from a "farming operation owned or operated by such person," the court found it must consider the character of the various subparts of the debtor's operation:

> [T]his court concludes that an agribusiness enterprise is not per se a person who derives its income from a farming operation. Rather, the determination must be made by considering the character of the business and whether its income is derived from its own farming or production efforts as opposed to the farming or production efforts of others.

*Id.* at 656.

The court concluded that the income derived from the purchase of eggs produced by others was not income from a farming operation and, because the debtor derived substantial income from that source, it was not a farmer for purposes of §§ 303 and 101(17).

The conclusion is supported by the Tenth Circuit's decision in *Matter of Beery,* 680 F.2d 705 (1982). There the court of appeals upheld a determination that the debtor was not a farmer under the Bankruptcy Act based on a finding that the principal part of his gross income was derived from the sale of grain that was purchased from others for resale. Again, the Circuit did not have to consider the definition of a farming operation although the debtor raised grain on a large tract of ground.

Although the Tenth Circuit has held that feeding cattle in a feedlot is "farming" for tax purposes, even though the cattle belong to others, *Hi-Plains Enterprises, Inc. v. Commissioner,* 496 F.2d 520 (1974), it has also held that order buying of cattle by a person engaged in farming does not constitute a farming enterprise for the purposes of the Uniform Commercial Code. *Security National Bank v. Belleville Livestock Commission Co.,* 619 F.2d 840 (1979); *First State Bank v. Maxfield,* 485 F.2d 71 (1973). The definition of farming operation in the tax case was quite broad and the definition in the U.C.C. is very similar to that of the Bankruptcy Code. However, the U.C.C. phrase "farming operation" is generally afforded a narrow construction. *In re Butcher,* 43 B.R. 513, 519 (Bankr.E.D.Tenn.1984). The Circuit's prior rulings on farming operations are not inconsistent with a liberal interpretation of the Code.

Nontraditional enterprises are not barred from being considered "farming" in an appropriate context. *See In re McKillips,* 72 B.R. 565 (Bankr.N.D.Ill.1987) ("The Court will not confine itself to a natural or traditional, or even a dictionary definition of 'farming operation.' There may be other businesses which do not seem to fall within what is traditionally thought of as farming, ... but which very well may qualify for Chapter 12.") Generally, the cases suggest that some personal involvement is required to be a farmer; that acting as a middleman between producer and consumer without more is not sufficient contact with a farm product to qualify the handler as a farmer; that traditional farm pursuits carried on in nontraditional ways remain farming operations; and that the definition of farming operation is to be broadly construed. Something more than services performed at a rural location is necessary (although not all cases are in rural areas). All the chickens in the world would not make a dude ranch a farming operation. A veterinarian would not be a farmer merely because he/she works on livestock. Oil income produced on a "farm" would not be considered income from a farming operation. A custom cutter who has no other

"farming" activities or operations probably is not a farmer for the purposes of Chapter 12 though he may still be entitled to a tool of the trade exemption for the equipment used in the custom cutting operation. A traditional farming enterprise might be a farming operation, but fail to generate enough income to qualify the operator as a farmer.

As noted at the outset, the legislative history mandates a broad interpretation of "farming operation" to carry out the legislative intent. The courts should not adopt a single test of farming, but must keep in mind that agriculture changes. The old "totality of circumstances" test, taken broadly, should be applied.

> More simply, the definitions and the commentary cited above stress the notion of *raising* crops or livestock as the essence of farming. *It is this involvement in process of growing or developing crops and livestock that defines farming.* In the case of crops, farming contemplates the cultivation, caring for and harvesting of the crops. In the case of livestock, farming similarly contemplates the breeding, maintaining, and bringing to maturity of the animals and the subsequent marketing of the animals or their raw products.

*In re Butcher*, 43 B.R. at 519 (emphasis added).

■ While a rural location is by no means required, a location that would be considered a farm under the traditional definition should weigh heavily in the court's decision. The enterprise at the location should next be considered. Functions which are strictly service oriented, and which are merely tangentially related to the breeding, maintaining and marketing of animals or the planting, maintaining and harvesting of crops, even though performed on the farm would not qualify the actor as a farmer.

■ The type of product and its eventual market should be a factor. In this regard, the court should not be limited to products and produce which are traditionally associated with farming in the state of the court's location. In an effort to find a legally and profitably marketable product, many farmers are seeking to grow crops not traditionaly associated with farming. They should not be denied the protection of the Bankruptcy Code merely because their endeavors are not found in the laundry list of Old McDonald's farm. Ultimately, however, the farm should produce a product which is agricultural in nature. A sweater factory that knits sweaters from wool grown on the premises would not be a farm even though the starting point is raw wool.

Finally, the court should consider the debtor's role in the process. A nonresident owner might not qualify.

■ Here the Maikes reside on 365 acres in rural Wabaunsee County, Kansas. The crops are consumed by the game bird enterprise rather than being marketed together. They personally supervise breeding, raising, grooming, and marketing nearly 7,000 dogs a year. The fact that they purchase puppies and resell them does not defeat that conclusion as they groom, treat and medicate them in the interim before ultimate resale. Obviously there is some risk to the enterprise. While an analogy to a cattle feedlot can be carried only so far, if feeding and maintaining other people's cattle for ultimate resale is a farming operation, the same services performed with respect to dogs should also be considered farming. Their enterprise is not what would be considered traditional. A game farm and kennel operation, however, is a farming enterprise and should, under the totality of circumstances, be considered a farming operation. The motions of the FDIC and FLB to dismiss are denied.

The foregoing constitutes findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a) and Fed.R.Bankr.P. 7052. A separate judgment will be entered giving effect to the determinations reached herein.