**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee,*

           v.

RON PARK; MARY PARK,
           *Defendants-Appellants.*

No. 06-35886

D.C. No.
CV-05-00213-EJL

OPINION

Appeal from the United States District Court
for the District of Idaho
Edward J. Lodge, District Judge, Presiding

Argued and Submitted
April 11, 2008—Seattle, Washington

Filed August 11, 2008

Before: A. Wallace Tashima, M. Margaret McKeown, and
William A. Fletcher, Circuit Judges.

Opinion by Judge McKeown

10281

## COUNSEL

Syrena Hargrove, Assistant United States Attorney (argued); Thomas E. Moss, United States Attorney; Alan G. Burrow, Assistant United States Attorney; Boise, Idaho, for the plaintiff-appellee.

Linda Louise Blackwelder Pall (argued), Law Office of Linda Pall, Moscow, Idaho, for the defendants-appellants.

## OPINION

McKEOWN, Circuit Judge:

Ron and Mary Park own and operate a dog kennel, Wild River Kennels, on property along the Clearwater River in Idaho. Their property is subject to a scenic easement that was granted to the United States, which prohibits commercial activity but permits livestock farming. In this appeal, we are asked to determine the unusual question whether dogs are "livestock." Despite a gut inclination that the answer might be "no," resolution of the issue is not so clear, thus precluding summary judgment at this stage of the proceeding. As it turns out, the term "livestock" is ambiguous at best and much broader than the traditional categories of horses, cattle, sheep, and pigs.

## I. BACKGROUND

In 1973, Earl and Iona Monroe, the owners of a plot of land along the Middle Fork of the Clearwater River in Idaho, including a two-acre tract known as Tract 160A, granted the United States a scenic easement in accordance with the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271-1287.[1] The stated purpose of the easement is to allow the U.S. Forest Service "to administer such land to protect the scenic, recreational, geologic, fish and wildlife, historic, cultural, and other similar values [of the region] and to prevent any developments that

---

[1] The Wild and Scenic Rivers Act is meant to preserve "selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values . . . in free-flowing condition" for the benefit of current and future generations. 16 U.S.C. § 1271.

will tend to mar or detract from their scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values . . . ." Toward that end, the easement provides, in relevant part, that:

> 2. *RESTRICTIONS ON LAND USE BY GRANTORS*:
>
> a.  The lands within the easement area shall not be used for any professional or commercial activities except such as can be and are, in fact, conducted from a residential dwelling without outside alteration of the dwelling.
>
> . . .
>
> c.  The Grantors, their heirs and assigns, retain the right to use the easement for general crop and livestock farming and for limited residential development consistent with applicable State and local regulations. . . .

Ron and Mary Park purchased Tract 160A in 1989. At the time there was a chicken coop on the property. The Forest Service approved modifications that the Parks wished to make to some of the existing buildings and also approved the addition of horse stalls. In 1990, the Parks received approval to use a portion of their home as a craft and hobby shop. A year later, the Parks received approval to run a bed and breakfast from their home. In 1997, they began advertising that they were offering a dog training and kennel business, Wild River Kennels, on the property.

In early 1998, the Forest Service notified the Parks that their dog training and kennel business violated the terms of the easement. According to the Forest Service, the kennel was an unauthorized commercial activity and there were new structures associated with it that had been built without prior

approval. The Parks met with the Forest Service to discuss the dog kennel, but did not resolve the issue. Several years later, the dispute remained unsettled. In 2003, the parties exchanged letters on the matter, but, again, did not come to a resolution.

The United States filed suit in 2005. On cross-motions for summary judgment, the Parks argued that their dog kennel constituted "livestock farming," which is specifically permitted by the terms of the easement. The government contended that, under Idaho law, dogs are not livestock.

The district court held that the easement terms were "unambiguous," stating that "[r]egardless of how broadly one defines livestock farming, the Parks' activities do not fall within its terms." The court did not look to any particular source to define "livestock farming," but commented that the government's citations to Idaho law "further yield support for its interpretation." The district court granted summary judgment in favor of the government and ordered the Parks to cease their commercial operation and remove any associated structures or convert them to non-commercial use.[2] The court's order that the Parks remove or convert the structures was stayed pending this appeal.

---

[2]As a separate issue, the government challenged whether the kennels and other buildings were constructed in accordance with the procedures set forth in the easement. Finding material factual disputes, the district court denied summary judgment on this point. Although the district court granted only partial summary judgment, according to the district court docket, the case was erroneously terminated by the court's ruling. The parties, however, obtained a Rule 54(b) certification of judgment to permit an appeal. *See* Fed. R. Civ. P. 54(b) (permitting a district court to certify that a judgment as to one or some of the multiple claims presented is a final judgment if it "expressly determines that there is no just reason for delay."). We understand the district court's order that the kennel structures be removed or converted to a non-commercial use to be addressing the Parks' continued operation of their dog kennel, and not an order that reflects a decision with respect to whether the construction of the kennels was authorized.

We review de novo the district court's interpretation of a scenic easement. *Racine v. United States*, 858 F.2d 506, 508 (9th Cir. 1988). We disagree with the district court and conclude that the term "livestock," as used in the easement, is ambiguous, and we reverse the grant of summary judgment.

## II.  ANALYSIS

### A.  LIVESTOCK FARMING

[1] We generally follow state law to resolve property disputes, such as this issue of interpretation of an easement[3] *See Cortese v. United States*, 782 F.2d 845, 849 (9th Cir. 1986). Under Idaho law, courts construe a deed that conveys an interest in property to "give effect to the real intention of the parties." *Benninger v. Derifield*, 129 P.3d 1235, 1238 (Idaho 2006). Only if the language of the deed is ambiguous does the court look beyond the four corners of the deed to extrinsic evidence. *Id.* (internal citations omitted). "Interpretation of an unambiguous conveyance instrument is a question of law to be settled by its plain language." *Neider v. Shaw*, 65 P.3d 525, 530 (Idaho 2003). "Ambiguity exists only if language of the conveyance instrument is subject to conflicting interpretations." *Id.*

In a recent case, the Idaho Supreme Court addressed the question of an ambiguous easement. *Mountainview Landowners Coop. Ass'n, Inc. v. Cool*, 86 P.3d 484 (Idaho 2004). The easement granted Mountainview Landowners Cooperative Association the right to access a beach area on the Cools' property for "swimming and boating." These terms were not

---

[3]There is a "limited exception" to this rule "for cases in which relevant state law is hostile to a congressionally declared program of national scope." *Cortese*, 782 F.2d at 849. Although the protection of the Middle Fork of the Clearwater River in Idaho is part of a congressional program, the application of Idaho law to interpret the easement is not hostile to this program. *See United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 594-97 (1973).

defined in the easement. *Id.* at 487. The Idaho Supreme Court held that there was a "latent ambiguity over the term swimming."[4] *Id.* It observed that applying the strict definition of swimming found in the dictionary— "to propel oneself through water"— "could lead to illogical results" because it would exclude dangling one's feet in the water as well as prevent parents from acting as a lifeguard for their children. *Id.* (quoting WEBSTER II NEW RIVERSIDE DICTIONARY (1984)). The court further noted that there was not a uniform definition of swimming across dictionaries and that some definitions included "diving." *Id.* Because "more than one definition and interpretation of swimming exists," the court held that the term was ambiguous. *Id.*

[2] The Idaho Supreme Court's analysis guides our own. The scenic easement permits the Parks to engage in "livestock farming," but does not define this term. Still, we have no difficulty concluding that the district court erred in holding that "livestock," even broadly defined, could not include dogs.

[3] The term "livestock" stems from the Middle Ages, when it was used as a measure of wealth or to refer to property that could be moved, particularly to a market for trade. Online Etymology Dictionary, http://www.etymonline.com (last visited July 25, 2008). Later, the term began to be used in a more limited sense to describe cattle. *Id.* Today, the dictionary definition of "livestock" is sweeping, capturing every type of domesticated animal. For example, Merriam-Webster's Collegiate Dictionary defines "livestock" as "animals kept or raised for use or pleasure; *esp*: farm animals kept for use and profit." MERRIAM-WEBSTER COLLEGIATE DICTIONARY 728 (11th ed. 2003). The Oxford English Dictionary is

---

[4]As the court explained, " '[a] latent ambiguity is not evident on the face of the instrument alone, but becomes apparent when applying the instrument to the facts as they exist.' " *Mountainview Landowners Coop. Ass'n*, 86 P.3d at 487 (quoting *Matter of Estate of Kirk*, 907 P.2d 794, 801 (Idaho 1995)).

in accord and defines "livestock" as "animals, esp. on a farm, regarded as an asset." THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH 797 (9th ed. 1995).[5] Even Black's Law Dictionary defines "livestock" broadly as "domestic animals and fowls that (1) are kept for profit or pleasure, (2) can normally be confined within boundaries without seriously impairing their utility, and (3) do not normally intrude on others' land in such a way as to harm the land or growing crops." BLACK'S LAW DICTIONARY 953 (8th ed. 2004); *see also Levine v. Conner*, 540 F. Supp. 2d 1113, 1116 (N.D. Cal. 2008) (analyzing the dictionary definitions of the word "livestock" and observing that "the scope of domestic animals used or raised on a farm can potentially extend to guinea pigs, cats, dogs, fish, ants, and bees.").

**[4]** Despite the broad definitions in the dictionaries, we recognize that "livestock" has been used to describe a more limited set of animals such as cattle, horses, and pigs. The government calls our attention to § 25-1101 of the Idaho Code, which limits "livestock" to a narrow set of animals, namely, "cattle, horses, mules, or asses." Idaho Code § 25-1101. That section, however, pertains to brands and identifications affixed to the hide of an animal. Not surprisingly, this provision is not the only one in the Idaho Code that defines "livestock:" § 25-3601 states that cassowary, ostrich, emu, and rhea are "livestock" and § 25-3701 adds fallow deer, elk, and reindeer to the list. Idaho Code §§ 25-3601, 25-3701.

---

[5]The Parks urge us to follow the definition of livestock that the bankruptcy court applied for purposes of bankruptcy in *In re Maike*, 77 B.R. 832 (Bankr. D. Kan. 1987). In *Maike*, the bankruptcy court commented on the evolving nature of livestock operations that allowed farmers to continue to produce a profit from their land. *Id.* at 835-36. It declared that "[w]hile an analogy to a cattle feedlot can be carried only so far, if feeding and maintaining other people's cattle for ultimate resale is a farming operation, the same services performed with respect to dogs should also be considered farming." *Id.* at 839. Despite its superficial applicability, the bankruptcy court's understanding of farming and livestock in the context of providing bankruptcy protection does not shed light on how the parties intended to interpret the word "livestock" when the easement took effect.

**[5]** Idaho is not alone in having a statutory definition of "livestock" that identifies certain specific animals as "livestock." A cursory survey of case law and federal and state statutes uncovers multiple definitions of "livestock" that include particular subsets of domestic animals. For example, federal regulations under the Fair Labor Standards Act define "livestock" to include "cattle, sheep, horses, goats, and other domestic animals ordinarily raised or used on the farm," but notes that "[t]urkeys and domesticated fowl are considered poultry and not livestock." 29 C.F.R. § 780.328. Turning to state law, the Court of Appeals of Michigan has observed that Michigan law defines "livestock" as "horses, stallions, colts, geldings, mares, sheep, rams, lambs, bulls, bullocks, steers, heifers, cows, calves, mules, jacks, jennets, burros, goats, kids and swine, and fur-bearing animals being raised in captivity." *People v. Bugaiski*, 568 N.W.2d 391, 392 (Mich. Ct. App. 1997) (citing Mich. Comp. Laws § 287.261(2)) (emphasis omitted). In Iowa, "livestock" is defined as "cattle, horses, sheep, goats, swine (other than feeder swine), or any other animals of the bovine, equine, ovine, caprine or porcine species." Iowa Admin. Code r. 21-66.1(1). The Iowa Code also includes "all species of deer, elk, and moose raised under confinement or agricultural conditions for the production of meat, the production of other agricultural products, sport, or exhibition" as "livestock." *Id.*

**[6]** The language in the easement does not provide us with any more clarity on the meaning of the term. The statement of purpose neither compels nor eliminates a definition. The word "farming," which follows "livestock," is unhelpful because "to farm" is simply defined as "to engage in raising crops or animals." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY *supra* at 454. The government urges us to apply the definition of "livestock" that is found in § 25-1101, but there is nothing in the easement that unambiguously points us in this direction.

**[7]** The easement did not incorporate provisions of the Idaho Code by reference in a way that compels us to look to

the Idaho Code for the definition of "livestock," as opposed to considering the plain dictionary meaning. Although the easement states that the Parks may "use the easement area for general crop and livestock farming and for limited residential development consistent with applicable State and local regulations," the phrase "applicable State and local regulations" can be read as referring only to the easement's approval of "limited residential development," not to the term "livestock farming." *See Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (discussing the rule of the last antecedent).

The government's reliance on *Racine v. United States*, 858 F.2d 506 (9th Cir. 1988), is misplaced. The scenic easement at issue in *Racine* was specific, stating that " '[w]ith reference to 36 C.F.R. 292.16(g)(1), it is agreed that only one residence and one tenant dwelling are authorized within the easement area.' " *Id.* at 508. We held that the "only consistent reading" was to allow the structures permitted by § 292.16(g)(1) to be constructed in the easement area. *Id.* at 508-09. We could not ignore the express reference to the regulation, which was directly incorporated in the provision. The Parks' easement lacks similar specificity.

**[8]** The government's remaining arguments similarly fail to lead to the conclusion that "livestock farming" unambiguously excludes dogs. The Idaho Code should provide the definition of livestock, according to the government, because real property disputes are governed by state law. But, even though we apply Idaho law to interpret an instrument of conveyance, *see Benninger*, 129 P.3d at 1238, it does not follow that the definitions of the terms of the easement will be the same as the definitions given in the Idaho Code. Absent a direct and specific statutory reference in the easement or even a statutory provision closely related to the easement, nothing suggests that the plain meaning of the terms in the easement are defined with reference to specific Idaho statutory provisions. The terms must be understood to give effect to the intention of the parties. *See Benninger*, 129 P.3d at 1238.

**[9]** We are also not convinced that the Parks conceded that the Idaho Code controls the definition of livestock. The references to the Idaho Code in the Parks' pleadings and in their summary judgment filings pertain only to the law that should govern the interpretation of the easement. They expressly argued against the government's position that the Idaho Code should serve as the basis for the meaning of the terms in the easement.

**[10]** Finally, in support of its argument that the "regular use" of the land prior to the easement grant was "crop farming and cattle and horse ranching," the government offers extrinsic evidence— the Administrative Plan for the property that was prepared by the Monroes and the Forest Service at the time of the easement grant and a statement the Parks made in connection with their motion for summary judgment. Extrinsic evidence is admissible only when a term in the easement is ambiguous and the trier of fact must interpret the ambiguity in the first instance. *See Benninger*, 129 P.3d at 1238. Because the district court granted summary judgment on the ground that "livestock" was an unambiguous term, no trier of fact has interpreted the ambiguity and we will not comment on what the extrinsic evidence may demonstrate.

Given the lack of a uniform definition of "livestock" and the absence of any guidance within the four corners of the easement, we conclude that the term is ambiguous and summary judgment was premature.

**B.   COMMERCIAL ACTIVITY**

**[11]** The district court held that the Parks' dog kennel business was a prohibited commercial activity. Although the Parks are running the kennel for profit, this fact does not preclude the operation from also being a permissible livestock farming use. Farming surely can be undertaken for profit and the easement expressly states that the grantors, now the Parks, "retain the right" to engage in "general crop and livestock

farming."   This right was retained without exception. The only consistent way to understand the restriction is as prohibiting commercial activity except to the extent that it qualifies as "general crop and livestock farming."

Because the term "livestock farming" is ambiguous as it is used in the easement, interpretation of the easement cannot be resolved on summary judgment. The judgment of the district court is reversed and we remand for further proceedings.

**REVERSED AND REMANDED**.